UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| COREY DAY, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:22-CV-728-JD-MGG |
| NANCY MARTHAKIS, et al., | |
| Defendants. | |

OPINION AND ORDER

Corey Day, a prisoner proceeding without a lawyer, moves for a preliminary injunction. (ECF 6.) The court ordered a response from the Warden of Indiana State Prison ("ISP"), which has been filed. (ECF 17.) By operation of Northern District of Indiana Local Rule 7-1(d)(3)(B), any reply by Mr. Day was due October 11, 2022. That deadline has passed and no reply was received. The matter is now ripe for adjudication.

Mr. Day claims that since December 2021 he has been experiencing chest pain and shortness of breath. (ECF 5.) He claims that tests have shown "several abnormalities that all have precursors to several lung related ailments." (*Id.* at 1.) He further claims that he underwent an EKG in January 2022, which showed that he has "pulmonary issues going on with his heart and lungs." (*Id.* at 2.) He claims that he is in need of evaluation by an outside medical provider and additional diagnostic testing, including an MRI and CAT scan of his lungs. (*Id.*) He further alleges that his lung problems have been caused by the conditions at ISP, specifically, the presence of asbestos, black mold, and pigeon feces. (*Id.* at 5-6.) He was granted leave to proceed on

damages claims against certain medical personnel, and on a claim for injunctive relief against the Warden related to his ongoing need for treatment for the lung issue, and his ongoing need to be housed under sanitary conditions of confinement. (*Id.* at 8-10.) He now moves for immediate relief on those two issues.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true, nor do[es] [it] give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must conduct an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is significantly circumscribed; any remedial injunctive relief "must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citations and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining the strict limitations on granting injunctive relief in the correctional setting).

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove a claim, a prisoner must show (1) he has an objectively seriously medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the subjective prong, the prisoner must show that the defendant acted with deliberate indifference. *Estelle*, 429 U.S. at 104. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to prove

3

an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Inmates are "not entitled to demand specific care." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019). Nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id*. Courts will "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 ( citation and internal quotation marks omitted).

Likewise, under the Eighth Amendment, inmates are entitled to the minimal civilized measure of life's necessities in connection with their living conditions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In evaluating such a claim, courts conduct both an objective and a subjective inquiry. "[T]he Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), but inmates are entitled to reasonably adequate shelter and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). On the subjective prong, the prisoner must show that the defendant acted with deliberate indifference to his health or safety. *Farmer*, 511 U.S. at 834. This standard is satisfied "when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

4

Medical records submitted by the Warden reflect that Mr. Day has been seen more than a dozen times by medical staff since December 2021 for reports of chest pain and/or a problem with his lungs. He has undergone physical examinations, chest X-rays, EKGs, an echocardiogram, and lab tests, and has been given antibiotics, inhalers, and pain medication. He has been evaluated by two outside specialists, a pulmonologist and a cardiologist. (ECF 17-1 at 1-177.) They have not found any abnormality in his lungs or heart. (*Id.* at 44, 104, 113-14.) A nurse practitioner who examined him opined that his complaints of pain upon deep breathing may stem from a musculoskeletal injury that would take some time to heal; Mr. Day has reported several times that his symptoms improve with stretching and moving, and that he is able to exercise without incident. (*Id.* at 33, 35, 50, 53.) Records reflect that Mr. Day regularly engages in vigorous exercise; during the period he was complaining about chest pain he suffered a "boxing" injury to his hand. (ECF 17-1 at 71-73.) In May 2022, he was sent to an outside hospital for treatment for his hand, and while there he reported to hospital staff that he had ongoing chest pain. Hospital staff examining him found his heart and lung function to be normal. (*Id.* at 133-34.) He underwent another chest x-ray at the hospital, which was also unremarkable. (*Id.* at 136-37.) The doctor opined that he might be suffering from anxiety. (*Id.* at 137.)

At a few of his appointments he pinpointed the pain as coming from his upper back. A thoracic spine x-ray was ordered, which revealed mild lower disc degeneration but no acute abnormality. (*Id.* at 117.) At another visit his treating physician, Dr. Nancy Marthakis, had a "lengthy conversation" with him about his apparent practice of

"holding his breath while actively exercising." (*Id.* at 22.) His medical providers are of the view that his lungs and heart are normal and that he does not need further diagnostic testing or treatment for this issue. (*Id.* at 10, 12, 14, 22, 26, 35, 50.)

In arguing that test results show he does have a problem with his lungs and heart, he appears to be relying on a computerized EKG reading reporting a "pulmonary disease pattern." (*Id.* at 107.) However, the Warden has submitted evidence pointing out that computer-generated readings do not represent an official diagnosis by a trained medical professional. According to an article from the Journal of the American College of Cardiology, there are limitations and dangers of relying on computer-general EKG readings, which are based entirely on algorithms. (ECF 17-2.) The article warns that confirmation by a medical professional trained in reading EKGs is "essential" and is "repeatedly recommended in published reports." (*Id* at 1.) Mr. Day has not submitted anything to draw this evidence into question. Dr. Marthakis reviewed Mr. Day's EKG and other test results, and her opinion based upon her medical training is that his heart and lung function are within normal limits. (ECF 17-1 at 44, 104, 107, 113-14.)

The record reflects that prison medical providers have taken Mr. Day's complaints seriously, examining him and sending him for diagnostic testing. Although Mr. Day clearly disagrees with their opinions, he is not competent to make his own diagnosis or decide whether additional diagnostic testing is warrant. *See Lloyd v. Moats*, 721 F. App'x 490, 494–95 (7th Cir. 2017) ("[Plaintiff's] disagreement is irrelevant. He is not competent to diagnose himself, and he has no right to choose his own treatment."). He has not demonstrated a likelihood of success on his claim that medical staff have

been deliberately indifferent to a serious medical need, or that he will be irreparably injured if immediate relief is not granted.

As for the conditions of his confinement, the Warden has submitted affidavits from Deborah Taylor, the prison's Safety Hazard Manager and a registered technician in pest control, and Lieutenant Dujuan Lott, the supervisor of the segregation unit where Mr. Day is housed. (ECF 17-3; ECF 17-4.) They attest that there is no asbestos or black mold present in Mr. Day's cellhouse.[1] (*Id.*) Lieutenant Lott notes that some inmates have complained about mold in the shower, although he denies that it is "black" mold. (ECF 17-3 ¶ 6.) He acknowledges that the cellhouse shower gets dirty on "shower days," which involves in excess of 300 inmates taking showers (with approximately 33 inmates using each shower) on Mondays, Wednesdays, and Fridays. (*Id.* ¶ 7.) However, he attests that showers are regularly cleaned with proper cleaning chemicals on Tuesdays and Thursdays and additionally as needed, as are common areas in the cellhouse. (*Id.* ¶¶ 7-10.) Inmates are responsible for cleaning their own cells and are provided cleaning chemicals and other supplies twice weekly. (*Id.* ¶ 5.)

As for the allegations of excessive bird feces, Ms. Taylor acknowledges that birds occasionally get into cellhouses through doors that are left open during recreation time. (ECF 17-4 ¶ 2.) However, she attests that the prison uses live traps to trap and remove the birds. (*Id.*) She attests that the traps are very high up in the rafters and are out of

---

[1] The Seventh Circuit has recognized that "[e]xposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual." *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993). In any event, Ms. Taylor attests that there is no known asbestos at ISP at the present time, and to the extent there was any in the past, it was properly remediated. (ECF 17-4 ¶ 4.)

7

sight of inmates, such that inmates likely do not know they are there. (*Id.*) Nevertheless, she attests that birds are regularly trapped and removed, and that debris and feces left by the birds is cleaned whenever it is found, usually within days. (*Id.* ¶¶ 2-4.) She notes that Mr. Day filed a grievance on April 20, 2022, complaining about bird feces on the mesh covering the fans in his cell house. (*Id.* ¶ 3.) In response, the mesh was cleaned on May 3, 2022. (*Id.*)

The present record does not support a conclusion that Mr. Day is being exposed to excessive amounts of black mold, asbestos, or bird feces, or that he is suffering from an ailment caused by environmental contaminants. *See Mitchell v. Dane Cnty. Sheriff Dep't,* No. 16-CV-352-WMC, 2018 WL 851391, at *8 (W.D. Wis. Feb. 13, 2018) (inmate's condition-of-confinement claim failed where the evidence failed to show she was exposed to dangerous levels or mold or asbestos, or that the defendants were deliberately indifferent to those conditions); *Murithi v. Hardy*, No 13 C 00599, 2016 WL 890695 (N.D. Ill. Mar. 9, 2016) (inmate's condition-of-confinement claim failed where inmate saw mold in his cell, but there was no evidence that mold had made him ill or that the substance was in fact black mold). Mr. Day has not demonstrated a likelihood of success on his claim that he is being denied the minimal civilized measure of life's necessities in connection with his living conditions, or that he will suffer irreparable harm if immediate relief is not granted.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 6) is DENIED.

SO ORDERED on October 18, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT